## Hinesburg School District v. Vermont NEA

[522 A.2d 222]

No. 85-410

Present: **Allen, C.J., Hill, Peck, Gibson and Hayes, JJ.**

Opinion Filed December 29, 1986

*Dennis W. Wells* of *Downs, Rachlin & Martin*, Burlington, and *Nicholas DiGiovanni, Jr.* of *Morgan, Brown & Joy*, Boston, Massachusetts, for Plaintiff-Appellant.

*James S. Suskin*, Montpelier, and *Robert H. Chanin* and *Bruce R. Lerner* of *Bredhoff & Kaiser*, Washington, D.C., for Defendants-Appellees.

**Hayes, J.** This appeal arises out of unfair labor practice charges that were filed by the Hinesburg School District and Hinesburg School Board (School Board) before the Vermont Labor Relations Board (Labor Board) on May 13, 1985. The charges alleged violations of 21 V.S.A. §§ 1726(b)(1), (b)(3) and (b)(10), 16 V.S.A. §§ 1982(a) and (c), and 16 V.S.A. § 1991(c) by the Vermont-National Education Association, the Chittenden South Education Association, the Hinesburg Unit of the Chittenden South Education Association (Hinesburg Association), and the Burlington Education Association (hereafter, the above four education associations are called the "Teacher Associations").

By Memorandum and Order dated August 30, 1985, the Labor Board declined to issue an unfair labor practice complaint, and dismissed the charges filed by the School Board. The School Board appeals from that decision contending that the Labor Board abused its discretion. We disagree with that contention and affirm.

The School Board's charges stem from a labor dispute with the Hinesburg Association, the exclusive bargaining agent of the Hinesburg teachers. The Hinesburg Association negotiated with the School Board throughout 1984 and early 1985 in an effort to reach a new collective bargaining agreement for the 1984-85 school year. After negotiations reached an impasse, the teachers began a lawful strike on April 3, 1985. All twenty-nine teachers represented by the Association participated in the strike.

On April 3, 1985, the School Board decided to close the elementary school the following day. The school remained closed between April 4 and April 21, 1985, while the strike continued. On April 22, 1985, the School Board reopened the Hinesburg School by hiring permanent replacements for the striking teachers.

On May 13, 1985, the School Board filed unfair labor practice charges on behalf of the strike replacements. The School Board alleged first that the Teacher Associations and their agents unlawfully interfered with the rights of the strike replacements by engaging in certain conduct designed to harass and intimidate them. More particularly, the School Board charged that certain striking teachers (1) picketed in front of the homes of several replacement teachers; (2) distributed leaflets in the neighborhood of the replacements publicly attacking them by name because they accepted work at the school; (3) picketed and distributed literature at the place of business of the husband of one of the replace-

ment teachers; (4) engaged in several incidents of verbal harassment, threats and coercive actions against the replacement teachers; (5) attempted to disrupt the classes of the replacement teachers by encouraging students to be disruptive; and (6) sent coercive and threatening literature to the replacement teachers. All of these activities, according to the School Board, were engaged in by one or more of the striking teachers as agents of the Teacher Associations. The School Board also charged that the Hinesburg Association refused to represent the strike replacements in violation of 16 V.S.A. § 1991(c) and 21 V.S.A. § 1726(b)(3) because the replacements refused to join the Association or support the strike. In filing these charges, the School Board asked the Labor Board to issue a complaint and consolidate that complaint with the unfair labor practice complaint already pending before the Labor Board, stemming from separate charges filed against the School Board by the Hinesburg Association.*

Upon investigation of the School Board's charge, the Labor Board exercised its discretion pursuant to 21 V.S.A. § 1727(a) and declined to issue an unfair labor practice complaint. The Labor Board also dismissed those charges which alleged that the Hinesburg Association failed to represent the strike replacements.

On appeal, the School Board contends that the Labor Board abused its discretion in refusing to issue an unfair labor practice complaint based upon the charges filed by the School Board.

■ The Labor Board has discretionary authority to issue or to decline to issue an unfair labor practice complaint. It is the law in Vermont that "[w]henever a charge is made that any person has engaged in or is engaging in any unfair labor practice, the board *may* issue and cause to be served upon that person a complaint stating the charges . . . ." 21 V.S.A. § 1727(a) (emphasis added). Furthermore, the Rules of Practice of the Vermont Labor Relations Board, § 43.4, state that, once a charge has been filed, "if it appears to the Board that formal proceedings should be instituted, the Board *may* issue . . . a complaint." (emphasis added). A decision by the Board not to issue a complaint will be reversed on appeal only if the Board has abused its discretion.

---

* The Hinesburg Association alleged that the School Board committed unfair labor practices by its conduct during negotiations for a contract for the 1984-85 school year and during the ensuing strike that began April 3, 1985.

Observing that the bulk of the School Board's charges focused on alleged actions of strike misconduct by individual teachers, the Board concluded that the best way to handle these allegations would be through compliance proceedings arising from its reinstatement order, which order was recently affirmed by this Court. See *Chittenden South Education Association* v. *Hinesburg School District,* 147 Vt. 286, 514 A.2d 1065 (1986). In that order, the School Board was required to offer striking teachers reinstatement to their former jobs upon an unconditional offer to return to work. If, upon unconditional application, the School Board alleged that misconduct by individual strikers should result in their loss of right to reinstatement, the Board indicated that such issues could be litigated in compliance proceedings.

We are of the view that the Board did not abuse its discretion in holding that compliance proceedings "would provide the appropriate forum where the School Board could offer evidence on any alleged misconduct by individual strikers." If the School Board demonstrated individual striker misconduct, the Board would then decide what appropriate action to take, including a possible denial of reinstatement of the offending teacher based on strike misconduct.

In choosing this method of resolution, the Labor Board did not go off on a lark of its own. It followed established practice of the National Labor Relations Board (NLRB) to leave to compliance procedures the details of issues of reinstatement and back pay and striker misconduct affecting such issues. See *Clear Pine Mouldings, Inc.,* 268 N.L.R.B. 1044 (1984); *Windham Community Memorial Hospital,* 230 N.L.R.B. 1070 (1977). This NLRB practice has won approval by the federal courts. See *Sure-Tan, Inc.* v. *NLRB,* 467 U.S. 883, 902 (1984); *NLRB* v. *J. H. Rutter-Rex Manufacturing Co.,* 396 U.S. 258, 260 (1969); *NLRB* v. *J. H. Rutter-Rex Manufacturing Co.,* 245 F.2d 594, 598 (5th Cir. 1957). We see no valid reason to reject a practice long recognized and accepted in the field of labor relations. Moreover, we recognize that due regard must be given the Labor Board's function of assessing carefully the interests of both sides of any labor-management dispute in the light of the special circumstances of that controversy.

Under 21 V.S.A. § 1726(b), an unfair labor practice complaint may be issued against a union but not against individual employees. Although the Labor Board noted that "the charges filed by

the School allege violation by various teacher organizations and their agents in addition to the strikers themselves," and that its "refusal to issue a complaint will mean only the actions of individual strikers will be subject to further review," the Board dismissed the charges because:

> our review of the charge, memoranda and case law convinces us this is the best way to proceed. Our decision is influenced by Vermont-NEA General Counsel Robert Chanin's representation . . . in that Respondents have directed every striking teacher not to do what is alleged in the charge. To our knowledge, actions such as alleged in the charge have ceased and we believe it unnecessary to issue a complaint.

The Labor Board did not pass beyond the bounds of its broad authority in taking into account the directives of the Teacher Associations against the alleged strike misconduct and the cessation of that misconduct when it exercised its discretion not to issue a complaint. In a highly emotional strike situation, laden with public interest, we will not ask the Labor Board to function in a straight jacket nor will we substitute our judgment for the expertise of the Board. We recognize that a strike is not a game of tiddlywinks played according to the rules of a Victorian salon. Some confrontations between strikers and nonstrikers will inevitably occur. An employer is justified in refusing or delaying the reinstatement of strikers who have engaged in serious strike misconduct. Serious strike misconduct, however, does not include behavior which does not reasonably tend to coerce or intimidate, even though it may be abusive and uncalled for. See *Newport News Shipbuilding & Dry Dock Co. v. NLRB*, 738 F.2d 1404, 1408 (4th Cir. 1984). An unfair labor practice employer is precluded " 'from pointing to trivial incidents . . . and insulting language, spontaneously and in isolated instances, as justification for a refusal to offer reinstatement at the termination of the strike.' " *Id.* at 1408 (quoting *Oneita Knitting Mills, Inc. v. NLRB*, 375 F.2d 385, 390 (4th Cir. 1967)). We conclude that the Labor Board did not abuse its discretion in refusing to issue an unfair labor practice complaint on the School Board's charges.

The School Board next contends that the Labor Board erred in finding that the replacement teachers were illegally hired and that the Association had no obligation to represent them. The Board argues that the strike replacements were all fully cer-

tified teachers hired on a permanent basis and, as such, that they became part of the bargaining unit in Hinesburg when hired. Thus, the School Board contends that the Association had an obligation to represent these individuals as well as the striking teachers. The Labor Board dismissed these charges, and indicated that the Hinesburg Association is not required to represent illegally hired employees whom the School Board must discharge upon the strikers' unconditional application to return to work. When the question of whether a strike is an economic strike or an unfair labor practice strike is at issue, an employer hires permanent strike replacements at its own risk. This is so because if the Labor Board decides that a strike is an unfair labor practice strike, striker replacements must yield their positions to reinstated striking employees. *Belknap, Inc.* v. *Hale,* 463 U.S. 491, 493 (1983). Thus, permanent replacements are not permanent unless the School Board contracts to add additional positions to the school faculty, or unless striking employees decline to make unconditional offers to return to work or are refused reinstatement because of serious misconduct. *Id.*

Although appellant contends that the Labor Board erred in referring to the striker replacements as "illegally hired," it cites no apposite cases in support of its contention. We see no need here to determine when a striker replacement is or is not "illegally hired" and under what circumstances, if any, a union is obligated to represent striker replacements.

In sum, the Labor Board did not abuse its discretion or otherwise err in declining to issue an unfair labor practice complaint or in ordering dismissal of the School Board's unfair labor practice charges.

*Affirmed.*